IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

MARY E. MCDONALD          )
                          )
            Plaintiff,    )
                          )
       v.                 )   Case No.09-3467-CV-S-REL-SSA
                          )
MICHAEL J. ASTRUE, Commissioner)
of Social Security,       )
                          )
            Defendant.    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mary E. McDonald seeks review of the final decision
of the Commissioner of Social Security denying her application for
supplemental security income (SSI) benefits based on disability
under Title XVI of the Social Security Act (Act), 42 U.S.C. §§
1381, et seq.[1] Plaintiff argues that the administrative law judge
(ALJ) erred by rejecting the opinion of her treating physician that
plaintiff's residual functional capacity (RFC) precludes her from
working. I find that the ALJ did not err as alleged. Therefore,
plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

### I. BACKGROUND

This suit involves an application for supplemental security
income (SSI) benefits based on disability under Title XVI of the

_____

[1]Plaintiff filed an earlier Social Security disability lawsuit
that was assigned to me on consent. McDonald v. Barnhart, No. 05-
5002-CV-SW-REL-SSA. On October 11, 2005, I denied plaintiff's
motion for summary judgment in that case and affirmed the
Commissioner's decision.

Social Security Act (Act), 42 U.S.C. §§ 1381, et seq. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title XVI. See also 42 U.S.C. § 405(g).

Plaintiff filed her application for SSI benefits on April 6, 2006 (Tr. 152-57). After the application was administratively denied (Tr. 66-67, 74-78), plaintiff requested a de novo administrative hearing with an ALJ (Tr. 82).

Following a hearing, the ALJ found plaintiff was not disabled under the meaning of the Act in a decision dated July 31, 2009 (Tr. 9-18). In his decision, the ALJ found plaintiff suffered from the severe impairments of epilepsy and depressive disorder secondary to pain disorder (Tr. 11). However, the ALJ found plaintiff was not fully credible as to the effect of those impairments (Tr. 16). The ALJ found plaintiff could lift 10 pounds frequently, or 20 pounds occasionally; sit for six hours in an eight-hour workday; stand or walk for six hours in an eight-hour workday; and that she had other postural limitations like limitations to occasional balancing and stooping (Tr. 13). The ALJ also found plaintiff should avoid exposure to environmental hazards such as cold, heat, and humidity; and that she could only perform simple, repetitive tasks in a nonpublic environment with limited contact with peers and supervisors (Tr. 13). Based on plaintiff's residual functional

capacity, the ALJ found she retained the ability to perform a significant number of jobs found in the national economy (Tr. 17).

On October 14, 2009, the Appeals Council of the Social Security Administration denied plaintiff's request for further review (Tr. 1-3). Thus, the ALJ's decision is the Commissioner's final action.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?
        Yes = not disabled.
        No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff; Dr. Mary Jescoe, a vocational expert; Dr. John Morris, M.D., a medical

expert; and the documentary evidence admitted at the hearing.

Defendant has adopted the record set forth in plaintiff's brief (Defendant's brief, pg. 3).

### A. ADMINISTRATIVE REPORTS

### 1.    Plaintiff's earnings statement

Plaintiff's earnings statement shows the following income for the years indicated:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1974 | $   927.92 | 1989 | $    14.20 |
| 1975 | 85.01 | 1990 | 30.40 |
| 1976 | 394.90 | 1991 | 0.00 |
| 1977 | 401.20 | 1992 | 0.00 |
| 1978 | 1,021.38 | 1993 | 0.00 |
| 1979 | 102.66 | 1994 | 0.00 |
| 1980 | 142.96 | 1995 | 0.00 |
| 1981 | 814.25 | 1996 | 0.00 |
| 1982 | 765.66 | 1997 | 0.00 |
| 1983 | 50.84 | 1998 | 0.00 |
| 1984 | 63.85 | 1999 | 0.00 |
| 1985 | 405.59 | 2000 | 0.00 |
| 1986 | 0.00 | 2001 | 0.00 |
| 1987 | 0.00 | 2002 | 0.00 |
| 1988 | 0.00 | 2003 | 289.23 |

(Tr. 166).

**2.   Application summary for supplemental security income**

On April 6, 2006, plaintiff completed an application for supplemental security income (Tr. 152-57). In her application, plaintiff represented that her disability began on May 28, 1992 (Tr. 152); she has been married five times (Tr. 153); she has a prior felony conviction (Tr. 153); and she was then living at a home in Carthage, Missouri, with her child (Travis Thompson) and another relative (Kelly Thomson), who were purchasing the house (Tr. 153).

**3.   Disability report - field office**

On April 6, 2006, plaintiff was interviewed by D. Ackerson concerning her disability application (Tr. 397-400). Plaintiff listed her alleged onset date as May 28, 1992 (Tr. 397). The interviewer observed that plaintiff appeared to be "sleepy or very tired" and "[h]er eyes were droopy and her breath smelled of alcohol or strong mouth wash" (Tr. 399).

**4.   Disability report - adult**

In an undated disability report (Tr. 401-09), plaintiff listed her height as 5'11" tall and her weight as 125 pounds (Tr. 401). Plaintiff said that she is unable to work due to epilepsy and back problems (Tr. 402). Plaintiff indicated that these illnesses affect her short-term memory and her ability to sit or stand for very long because she has "to keep on the move" (Tr. 402). Plaintiff said that her conditions started in the 1980s and became disabling on

May 28, 1992 (Tr. 402). Concerning her employment history, plaintiff stated that "I have not[] worked very much" and that she was last employed on April 30, 2003 (Tr. 402). When asked why she stopped working, plaintiff's response was recorded as "unknown" (Tr. 402). Plaintiff said that her longest employment was as a cashier, which lasted "just a few days" (Tr. 403). Plaintiff listed her medications and the conditions for which they were prescribed as:

| | |
|---|---|
| Antibiotics | Lung condition |
| Dilantin | Seizures |
| Musinex | Lung congestion |
| Oxycontin | Pain |
| Proventil inhaler | Breathing |
| Triamterene | High blood pressure |
| Valium | Stress and high blood pressure |

(Tr. 407).

Plaintiff reported having an eighth-grade education, which she completed in May 1972 (Tr. 408).

### 5.    Disability determination

On June 2, 2006, Alison Alaimo, a disability medical examiner, noted that plaintiff had failed to return required paperwork, and after 10 days plaintiff's claim was being denied for insufficient evidence (Tr. 66-67).

### 6.    Physical Residual Functional Capacity Assessment

On June 2, 2006, Alison Alaimo, a disability medical examiner, completed a physical residual functional capacity assessment on plaintiff based on available medical records (Tr. 522-27). The

assessment concludes that plaintiff can occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; and is unlimited in her ability to push or pull (Tr. 523-24). The assessment states that plaintiff should only occasionally balance and kneel (Tr. 525). Concerning environmental limitations, the assessment indicates that plaintiff should avoid extreme cold and hazards (Tr. 526).

**7. Psychiatric review technique**

On June 2, 2006, Elisa Lewis, Ph.D., a DDS psychologist, completed a psychiatric review technique on plaintiff (Tr. 532-44). However, findings were not made because the doctor had insufficient evidence from which to derive opinions. The notes state: "[Claimant] failed to return her ADLs [activities of daily living], despite contact being made with the 3rd party. [Claimant] does not appear to have a listing level impairment due to normal exam 3/06, and CR [case reporter] observation indicating a possible DAA [drug or alcohol addiction] issue. There is insufficient evidence to determine the severity of [claimant's] impairments due to ADL failure" (Tr. 544).

**8. Critical request evaluation sheet**

On August 7, 2008, a critical request evaluation sheet records that plaintiff was not then "without food, shelter or medical,"

observes that plaintiff's case was then "under ALJ review," and concludes that "critical criteria not met" (Tr. 87-88).

### B. SUMMARY OF MEDICAL RECORDS

On June 4, 2004, plaintiff went to John K. Williams, M.D., and underwent a lumbar spine x-ray that showed chronic deformity of L2 suggesting an old, healed fracture; mid and lower lumbar spondylosis and degenerative disc disease, predominate at L5-S1; and bilateral L5 spondylosis; no spondylolisthesis was evident (Tr. 1024). Dr. William performed an MRI of plaintiff's lumbar spine which revealed diffuse lumbar spondylosis and degenerative disc disease, most notable at L5-S1, and moderate bilateral L5-S1 foraminal stenosis, diffuse disc bulging at L5-S1 with small central disc protrusion producing mild central spinal stenosis, and chronic deformity of L2 representing an old healed L2 fracture (Tr. 1028).

On February 1, 2005, plaintiff went to Barton County Memorial Hospital and underwent computed tomography of the lumbar spine by Wayne E. Putnam, D.O., Diagnostic Radiologist, that revealed moderate arthritic changes involving the L5-S1 level with disc degeneration, no evidence of disc herniation, and no acute pathology (Tr. 518). That same day, she had a chest x-ray that showed mild arthritic change and mild compression superior end plate T9 of chronic presentation associated with osteoporosis (Tr. 520). Dr. Putnam also took a lumbar spine x-ray that revealed

10

moderate osteoarthritis with disc degeneration L5-S1 level and no acute bony pathology (Tr. 521).

On June 23, 2005, plaintiff went to Barton County Memorial Hospital and underwent a cervical spine x-ray by Dr. Joseph S. Field that revealed moderately severe degenerative arthritis of the mid cervical spine C5-C6, C6-C7 level and no evidence of fracture (Tr. 516).

On June 27, 2005, plaintiff went to Barton County Memorial Hospital and underwent an MRI of her cervical spine by Dr. Putnam that revealed mild disc degeneration C5-C6, C6-C7 level, mild to moderate osteoarthritis at C5, C6, C7, mild disc osteophyte complex bulge and nerve root compression at C2-C3, C3-C4, C4-C5 on the left, mild to moderate disc osteophyte complex bulge and nerve root compression at C5-C6 on the right and left, mild disc osteophyte complex bulge at C6-C7, and no disc herniation (Tr. 512).

On April 27, 2006, plaintiff went to Barton County Memorial Hospital and underwent a lumbar spine x-ray by Dr. Lowell K. Pottenger that showed mild depression of the superior end plate of the vertebral body of L2 (unchanged), which may be the result of an old injury, and evidence of degenerative disc disease at the L5-S1 level (Tr. 1256). Plaintiff also had an MRI of her cervical spine that showed evidence of degenerative disc disease of the C5-C6, C6-C7, and C7-T1 levels with central sub ligamentous bulging of the intervertebral discs into the ventral aspects of the spinal canal

(Tr. 1258). The notes conclude that "[t]he study fails to demonstrate significant narrowing of the AP diameter of the spinal canal or significant foraminal stenosis. Signal intensities from the cord are within normal limits. The cerebellar tonsils are in normal positions" (Tr. 1258).

On April 27, 2006, plaintiff went to Barton County Memorial Hospital and underwent a MRI of her lumbar spine by Dr. Lowell K. Pottenger that showed evidence of degenerative disc disease at the L5-S1 level with a central posterior disc bulge, which did not significantly impinge upon adjacent nerve rootlets or significantly narrow the AP Diameter of the spinal canal. There was evidence of facet hypertrophy at the L4-L5 and L5-S1 levels bilaterally without significantly narrowing the neural foramina or AP diameters of the spinal canal. There were no abnormalities of the conus medullaris, and slight depression of the superior end plate of the vertebral body of L2 most consistent with that produced by Schmorl's node (Tr. 1259).

The record includes treatment notes of Timothy Sprenkle, D.O., which indicate that plaintiff had complaints of right leg numbness, back pain, swelling in her extremities, and was diagnosed with back pain with right leg radiculopathy, a seizure disorder, Hepatitis C, discogenic disc disease, Raynaud's phenomenon[2], and fibromyalgia

_____

[2]Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block the flow of blood to the fingers, toes, ears, and nose.

(Tr. 453-457, 460, 464, 468-70).

On March 5, 2007, Dr. Sprenkle, plaintiff's treating doctor, rendered his opinion as to plaintiff's physical impairments in a medical source statement (Tr. 957-61). Dr. Sprenkle represented that plaintiff's medical impairments have lasted or can be expected to last at least 12 months or longer, and that plaintiff is not a malingerer (Tr. 957). Dr. Sprenkle noted that emotional and psychological factors contribute to plaintiff's symptoms and limitations, and the doctor identified depression, anxiety, and somatic/somatoform disorder as the psychological conditions affecting or contributing to plaintiff's condition (Tr. 958). Dr. Sprenkle noted that in a typical workday plaintiff would frequently experience symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks (Tr. 958). Dr. Sprenkle concluded that plaintiff is incapable of even low stress jobs (Tr. 958).

Dr. Sprenkle noted that plaintiff could sit 15-20 minutes at one time; stand 5-10 minutes at one time; sit a total of less than two hours in an eight-hour workday; stand/walk a total of less than two hours in an eight-hour workday; and that plaintiff would be required to change positions at will from sitting, standing, or walking (Tr. 959). Dr. Sprenkle wrote that plaintiff has a medical need to lie down, recline, or elevate her feet to alleviate pain, fatigue, or other symptoms during a typical eight-hour workday (Tr.

959).

Concerning plaintiff's ability to lift and carry, Dr. Sprenkle wrote that plaintiff could occasionally lift and carry less than 10 pounds, that plaintiff could rarely lift 10 pounds, and that plaintiff could never lift 20 pounds or more (Tr. 959).

Concerning plaintiff's postural limitations, Dr. Sprenkle indicated that plaintiff can rarely twist, stoop, bend, kneel, crouch/squat, crawl, and climb stairs; and that plaintiff should never climb ladders (Tr. 960). As to plaintiff's manipulative limitations, Dr. Sprenkle opined that plaintiff could occasionally reach, finger, and feel, and that plaintiff could rarely handle and grip (Tr. 960).

Dr. Sprenkle indicated that plaintiff would likely be absent from work more than four days per month as a result of her symptoms and/or required treatment (Tr. 960). Dr. Sprenkle represented that the functional limitations for plaintiff are reasonably consistent with the general nature of plaintiff's diagnosed medical impairments (Tr. 960). In completing the medical source statement, Dr. Sprenkle explained that he relied upon his personal exams of plaintiff, his treating relationship with plaintiff, and a review of his records for plaintiff (Tr. 961). Dr. Sprenkle indicated that he did not rely on "[s]pecific clinical tests" in arriving at his opinions (Tr. 961).

On September 9, 2007, plaintiff underwent a lumbar spine x-ray that revealed mild scoliosis, diffuse lumbar spondylosis, and degenerative disc disease, especially at L5-S1 (Tr. 681). Plaintiff also had an x-ray of her sacrum and coccyx that revealed degenerative disc disease and spondylosis (Tr. 682).

On September 17, 2007, Dr. Sprenkle recorded his opinions about plaintiff's mental impairments in a medical source statement (Tr. 768-71). Dr. Sprenkle indicated that plaintiff is markedly limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Tr. 769-70).

Dr. Sprenkle represented that plaintiff's medical impairments have lasted or can be expected to last at least 12 months or longer (Tr. 770). Dr. Sprenkle indicated that he did not know whether

plaintiff was a malingerer (Tr. 770). Dr. Sprenkle indicated that plaintiff has a history of drug or alcohol abuse/addiction, and that the medical source statement does not set forth his professional opinion of only the limitations remaining if plaintiff stopped using or abusing drugs or alcohol (Tr. 771). Dr. Sprenkle wrote that plaintiff would likely be absent from work more than four days per month as a result of her symptoms and/or required treatment (Tr. 771). In completing the medical source statement, Dr. Sprenkle represented that he relied upon his personal exams of plaintiff, his treating relationship with plaintiff, a review of his records for plaintiff, subjective reports by plaintiff, and the general nature and seriousness of plaintiff's specific medical diagnosis (Tr. 771). Dr. Sprenkle indicated that he did not rely on "[s]pecific clinical test results" (Tr. 771).

On December 3, 2007, Dr. Sprenkle gave his opinion as to plaintiff's physical impairments in a medical source statement (Tr. 880-85). Dr. Sprenkle indicated that plaintiff's medical impairments have lasted or could be expected to last at least 12 months (Tr. 881). Dr. Sprenkle indicated that plaintiff is a malingerer (Tr. 881). Dr. Sprenkle noted that emotional and psychological factors contribute to plaintiff's symptoms and limitations, and the doctor identified depression, anxiety, and somatic/somatoform disorder as the psychological conditions affecting or contributing to plaintiff's condition (Tr. 881).

Dr. Sprenkle represented that in a typical workday plaintiff would frequently experience symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks (Tr. 881). Dr. Sprenkle concluded that plaintiff is incapable of even low stress jobs (Tr. 882).

Dr. Sprenkle opined that plaintiff could sit 20 minutes at one time; stand 15 minutes at one time; sit a total of about four hours in an eight-hour workday; stand/walk a total of about two hours in an eight-hour workday; and that plaintiff would be required to change positions at will from sitting, standing, or walking (Tr. 882). Dr. Sprenkle indicated that plaintiff has a medical need to lie down, recline, or elevate her feet to alleviate pain, fatigue, or other symptoms during a typical eight-hour workday (Tr. 883).

As to plaintiff's ability to lift and carry, Dr. Sprenkle opined that plaintiff could occasionally lift and carry 10 pounds or less, and that plaintiff could rarely lift 20 pounds or more (Tr. 883). Concerning plaintiff's postural limitations, Dr. Sprenkle opined that plaintiff can occasionally twist and rarely stoop, bend, kneel, crouch/squat, crawl, climb ladders, and climb stairs (Tr. 883). Regarding plaintiff's manipulative limitations, Dr. Sprenkle concluded that plaintiff can occasionally reach, handle, grip, finger, and feel (Tr. 884). Dr. Sprenkle represented that plaintiff would likely be absent from work more than four days per month as a result of her symptoms and/or required treatment

(Tr. 884).

In completing the medical source statement, Dr. Sprenkle wrote that he relied upon his personal exams of plaintiff, his treating relationship with plaintiff, a review of his records for plaintiff, and the general nature and seriousness of plaintiff's specific medical diagnosis (Tr. 884). Dr. Sprenkle indicated that he had not relied on "[s]pecific clinical test results" in reaching his conclusions (Tr. 884)

### C. SUMMARY OF TESTIMONY

#### 1. Plaintiff's testimony

Plaintiff acknowledged that she had once received benefits for the period of July 1992 to January 2002, but lost them when she was incarcerated for DWI (driving while intoxicated) (Tr. 24). Since then, plaintiff has been seeking restoration of her benefits (Tr. 23).

Plaintiff suffers from grand mal seizures which prevent her from working (Tr. 24). Plaintiff said she has these seizures about once a month, or it could be once every three months (Tr. 24). She is taking Dilantin for her seizures and is taking the medication as prescribed (Tr. 25). Plaintiff will go the emergency room for her seizures, but she does not go to the emergency room every time she has a seizure (Tr. 25). Plaintiff could not recall the last time she had to be treated for a seizure (Tr. 25).

Plaintiff suffers from degenerative disc disease of the lumbar and cervical spine, which prevents her from working (Tr. 26). Plaintiff experiences constant back and neck pain on a daily basis (Tr. 26). On a scale of 1-10, she would rate her back and neck pain at an 8, and her pain gets worse with activity (Tr. 26).

Plaintiff takes one to three Hydrocodone 10 (Vicodin)[3] tablets at a time for her back and neck pain, which helps reduce the pain (Tr. 27-28). Plaintiff characterized her back and neck pain with medication as a 2 on the 1-10 pain scale (Tr. 28). Plaintiff takes OxyContin,[4] along with the Vicodin, and has been on both drugs since 2006 (Tr. 27). Plaintiff said that with both OxyContin and Vicodin, her pain level is reduced to a 2 (Tr. 28).

Later, plaintiff testified that she takes Hydrocodone (Vicodin) for breakthrough pain after taking the OxyContin (Tr. 28). Plaintiff said she was prescribed Morphine for her back and neck pain, but she had an allergic reaction to the drug and had to stop taking it (Tr. 28). Later, plaintiff contradicted her earlier testimony and said that she had discontinued OxyContin to treat her back and neck pain because she could not afford the medication (Tr. 29). Finally, plaintiff reported that she was then taking Vicodin for breakthrough pain, using it three to four times daily (Tr. 30).

---

[3]Acetaminophen (Tylenol) and hydrocodone (a narcotic).

[4]OxyContin, an opioid, is a controlled-release form of oxycodone prescribed to treat chronic pain.

Concerning other medications, plaintiff testified that she was then taking drugs for emphysema (caused by smoking) and was using inhalers (Tr. 31). She testified that she will use four different inhalers in a day to treat shortness of breath caused by exertion and heat (Tr. 31). Plaintiff reported taking Triam HCTZ for high blood pressure (Tr. 31), and Valium, three times daily, for depression and anxiety (Tr. 32). Plaintiff testified that the medication she takes for edema makes her go to the bathroom frequently (Tr. 42-43). Plaintiff stated that she goes to the bathroom to urinate on average 10 to 12 times per day (Tr. 43).

Plaintiff testified that she could lift and carry ten pounds on a regular basis (Tr. 34); she could not sit comfortably and would have to constantly move, but that she could sit in a chair and move around in a chair for an hour (Tr. 34); she could not sit for an eight-hour day that included a break every two hours for 15 minutes, and a lunch break (Tr. 34); and she could stand and/or walk for a maximum of 15 to 20 minutes (Tr. 35). Plaintiff testified that she occasionally uses a cane for walking, but that she did not bring it with her to the hearing (Tr. 35).

Plaintiff testified that she could not work full-time in any capacity due to seizures and pain (Tr. 36). Plaintiff had tried working part-time as a cashier, but she was let go because she could not stand (Tr. 36).

Plaintiff has a license to drive (Tr. 37). Typically during the day she cleans house, helps take care of a man who is sick and on a respirator, does household chores, and does some yard work (Tr. 37). Plaintiff moves from house to house, and was then living with the man on the respirator in exchange for lodging and food (Tr. 37). Plaintiff is not receiving any government benefits, such as food stamps (Tr. 41).

Plaintiff has Raynaud's disease but really does not know what it is (Tr. 43). As a result of her Raynaud's disease, plaintiff's feet and hands turn black due to poor circulation, and her arms and legs go numb (Tr. 43).

Plaintiff was diagnosed and treated for fibromyalgia and lupus, and she has suffered from these conditions for the last six to seven years (Tr. 44). Plaintiff experiences swelling in her ankles, legs, and hands as a result of her lupus (Tr. 44). Plaintiff also has arthritis (Tr. 44).

Plaintiff testified that her pain and anxiety interfere with her sleep (Tr. 44), and that she does not feel well-rested when she wakes up in the morning (Tr. 45-46). She lies down for short periods of time about three times during the day for approximately an hour and a half each time (Tr. 46).

## 2. Medical examiner's testimony

Dr. John R. Morse testified that as of April 2006, plaintiff had the following physical impairments:  chronic obstructive airway

disease and emphysema, secondary to long-term tobacco abuse (Tr. 50). The doctor said that although plaintiff has these conditions, the records show that "at all times she was treated and improved" (Tr. 50).

Concerning plaintiff's chronic obstructive airways disease, the doctor noted that there were no pulmonary function studies done on plaintiff when she was in a stable state, which was noted by one of her treating physicians, and therefore created difficulty in determining "the degree of pulmonary disease that she has" (Tr. 50).

Concerning plaintiff's chronic seizure disorder, the doctor observed that although plaintiff has been admitted to the hospital for breakthrough seizures, this was "usually due to her non-compliance with her medications" (Tr. 51). Dr. Morse opined that when plaintiff is on her medications, her seizures are well controlled (Tr. 51).

As to plaintiff's chronic pain syndrome, Dr. Morse observed that she has degenerative disc disease of the lumbar spine, and that a 2005 MRI documented some multi-level degenerative joint and disc disease (Tr. 52). However, there are no attending orthopedic or neurosurgical comments on the MRI, which raises questions about the severity of the resulting pain (Tr. 52).

Concerning plaintiff's Hepatitis C, Dr. Morse testified that plaintiff's liver function is normal (Tr. 52).

As to plaintiff's complaints of fibromyalgia, lupus, and Raynaud's, Dr. Morse testified that he did not see any evidence in the medical records to support these diagnoses (Tr. 52), and plaintiff's counsel did not bring any such records to the doctor's attention during cross-examination (Tr. 55-58).

Finally, concerning plaintiff's high blood pressure, Dr. Morse observed that plaintiff is on medication for that condition (Tr. 52).

Dr. Morse concluded that plaintiff's impairments do not meet or equal a listing (Tr. 52).

Concerning exertional limitations, Dr. Morse testified that plaintiff could lift 10 pounds frequently; lift 20 pounds occasionally; stand and walk for six hours out of an eight-hour workday with normal breaks; and sit for six hours out of an eight-hour workday with normal breaks (Tr. 53). Dr. Morse testified that there were no push/pull limitations (Tr. 53). Dr. Morse testified that plaintiff should avoid ramps, stairs, ladders, ropes and scaffolds (Tr. 53-54); could balance, stoop, kneel, crouch, and crawl occasionally (Tr. 54); and has no specific manipulative, visual, or sensory limitations (Tr. 54). Plaintiff should avoid concentrated exposure to cold, heat, wetness, humidity, all hazardous machinery, and heights (Tr. 54).

Dr. Morse acknowledged that he had not conducted an examination of plaintiff (Tr. 58).

### 3.    Vocational expert's testimony

Dr. Mary Jescoe, the vocational expert, testified that given the limitations identified by Dr. Morse, there would remain 215 light, unskilled job titles that plaintiff could perform (Tr. 61-62). The examples given by the vocational expert included a small part assembler, DOT 929.587-010, light, with 920 jobs regionally, and 1.1 million jobs nationally (Tr. 62); a textile assembler, DOT 780.687-046, light, with 550 jobs regionally, and 1.2 million jobs nationally (Tr. 62-63); and a garment folder, DOT 789.687-066, light, with 880 jobs regionally, and 1.2 million jobs nationally (Tr. 63).

The vocational expert, when asked to accept as true Dr. Sprenkle's December 2007 medical source statements about plaintiff's limitations, testified that the doctor's assessment would preclude plaintiff from working full-time because of missed days (Tr. 60-61).

The vocational expert, when asked to accept as true plaintiff's testimony about her limitations and complaints, said that plaintiff would be unable to sustain full-time employment with such limitations (Tr. 63).

### D. FINDINGS OF THE ALJ

On July 31, 2009, the Honorable Edward D. Steinman, ALJ, entered his decision on plaintiff's case, finding that plaintiff has not been under a disability since her alleged onset date of

April 6, 2006 (Tr. 9-18). The ALJ found that:

1.  Plaintiff has not engaged in substantial gainful activity since April 6, 2006;

2.  Plaintiff has the following severe impairments: epilepsy, depressive disorder secondary to pain disorder;

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments;

4.  Plaintiff retains the residual functional capacity to lift 10 pounds frequently, 20 pounds occasionally, there are no additional limitations for pushing or pulling; she can stand/walk six hours in an eight-hour workday with normal breaks; she can sit six hours in an eight-hour workday with normal breaks; no climbing ramps, stairs, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; there are no manipulative, visual, or sensory limitations; she should avoid concentrated exposure to cold/heat, wetness, and humidity, and avoid heights and hazardous machinery; she should do simple repetitive tasks, nonpublic work, and have limited contact with peers and supervisors;

5.  Plaintiff has no past relevant work;

6.  Plaintiff was born in 1958, and was 47 years old, which is defined as a younger individual age 18-49, on the date her application was filed;

7.  Plaintiff has a limited education and is able to communicate in English;

8.  Transferability of job skills is not an issue because plaintiff does not have past relevant work;

9.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform; and

10. Plaintiff has not been disabled since April 6, 2006 (Tr. 9-18).

As to Dr. Sprenkle's opinions, the ALJ acknowledged that such opinions are usually entitled to significant weight on the question of disability (Tr. 16). However, because Dr. Sprenkle's opinion that plaintiff is incapable of performing even sedentary work is not supported by the doctor's medical records and is not consistent with the other substantial evidence in the record, the ALJ declined to rely on his opinion but instead adopted the opinion of Dr. Morse, the agency's examining physician, concluding that plaintiff can perform sedentary work (Tr. 16).

## V. TREATING PHYSICIAN'S OPINION

Plaintiff alleges that the ALJ erred by failing to rely on the opinions of Dr. Sprenkle, plaintiff's treating physician. Defendant responds by arguing that the ALJ did not err because Dr. Sprenkle's opinions are not corroborated by his contemporaneous medical records for plaintiff and his opinions are not supported by other substantial evidence in the record. I agree with defendant.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much

weight to give to the opinion of the treating physician:  (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor.  20 C.F.R. § 404.1527(d)(2)-(5).

Summarizing, Dr. Sprenkle provided three medical source statements:

On March 5, 2007, Dr. Sprenkle opined that plaintiff is incapable of performing even simple work tasks (Tr. 985);

On September 17, 2007, Dr. Sprenkle opined that plaintiff would likely be absent from work more than four days per month as a result of her mental impairments (Tr. 771); and

On December 3, 2007, Dr. Sprenkle opined that plaintiff had neither the physical nor mental capacity to work but if she did work, she would be absent from work more than four days per month as a result of her conditions (Tr. 884).

The ALJ discounted Dr. Sprenkle's opinions because they are not supported by the doctor's contemporaneous medical records for plaintiff and that they are not supported by other substantial medical evidence in the record (Tr. 16 ).

In an effort to demonstrate corroboration for Dr. Sprenkle's medical source statements, plaintiff's counsel refers to the doctor's medical records. Specifically, plaintiff's brief states the following:

Dr. Timothy Sprenkle's treatment notes indicate that plaintiff had complaints of right leg numbness, back pain, swelling in her extremities, and was diagnosed with back pain with right leg radiculopathy, a seizure

disorder, Hepatitis C, discogenic disc disease, Raynaud's phenomenon, and fibromyalgia (Tr. 453-57, 460, 464, 468-70) (Plaintiff's brief, pg. 8).

These records do not lend support for the sweeping opinions given by Dr. Sprenkle concerning plaintiff's limitations:

◆   Tr. 453 deals with a March 30, 2006, office visit where plaintiff complained about a sinus infection, a pulled back, and leg numbness, and the notes state "Need MRI lumbar."

◆   Tr. 454 deals with a March 1, 2006 office visit for a checkup, where the notes indicate a referral to Dr. Kremer and a directive for plaintiff to stop smoking.

◆   Tr. 455 deals with a February 1, 2006, office visit for a check up.

◆   Tr. 456 deals with a January 11, 2006, office visit where plaintiff complained of a deep cough and swollen hands.

◆   Tr. 457 deals with a December 29, 2005, office visit where plaintiff complained of bronchitis and was observed to still be smoking.

◆   Tr. 460 deals with a September 14, 2005, office visit where plaintiff complained about a hacking cough.

◆   Tr. 464 deals with a June 27, 2005, office visit where plaintiff complained about neck and back pain, and was given Flexeril, a muscle relaxer.

◆   Tr. 468 deals with a March 23, 2005, office visit where plaintiff complained about being moody and having back pain, and was treated with medication.

◆   Tr. 469 deals with a February 23, 2005, office visit for a checkup where plaintiff was treated with medication and the notes show an entry "may need Carotid Doppler."[5]

_____

[5]Carotid Doppler test uses sound waves to measure flow of blood through the large carotid arteries that supply the brain. The test can help doctors determine stroke risk.

◆    Tr. 470 deals with an office visit on January 26, 2005, when plaintiff moved back to the area from Kansas and was getting reestablished.

Plaintiff' counsel also refers to various tests (e.g. x-rays, MRIs) as support Dr. Sprenkle's medical source statements. Summarizing these tests:

◆    On June 4, 2004, plaintiff went to Dr. William and underwent a lumbar spine x-ray that showed chronic deformity of L2 suggesting old, healed fracture, mid and lower lumbar spondylosis and degenerative disc disease, predominate at L5-S1, and bilateral L5 spondylosis; no spondylolisthesis was evidence (Tr. 1024).

◆    On June 4, 2004, plaintiff went to Dr. William and underwent an MRI of her lumbar spine that revealed diffuse lumbar spondylosis and degenerative disc disease, most notable at L5-S1, and moderate bilateral L5-S1 foraminal stenosis, diffuse disc bulging at L5-S1 with small central disc protrusion producing mild central spinal stenosis, and chronic deformity of L2 representing old healed L2 fracture (Tr. 1028).

◆    On February 1, 2005, plaintiff went to Barton County Memorial Hospital and underwent computed tomography of the lumbar spine by Dr. Putnam, Diagnostic Radiologist, that revealed moderate arthritic changes involving the L5-S1 level with disc degeneration, no evidence of disc herniation, and no acute pathology (Tr. 518).

◆    On February 1, 2005, plaintiff went to Barton County Memorial Hospital and underwent a chest x-ray by Dr. Putnam that showed mild arthritic change, and mild compression superior end plate T9 of chronic presentation associated with osteoporosis (Tr. 520).

◆    On February 1, 2005, plaintiff went to Barton County Memorial Hospital and underwent a lumbar spine x-ray by Dr. Putnam that revealed moderate osteoarthritis with disc degeneration L5-S1 level, and no acute bony pathology (Tr. 521).

◆    On June 23, 2005, plaintiff went to Barton County Memorial Hospital and underwent a cervical spine x-ray by Dr. Field that revealed moderately severe degenerative

arthritis of the mid cervical spine C5-C6, C6-C7 level, and no evidence of fracture (Tr. 516).

♦ On June 27, 2005, plaintiff went to Barton County Memorial Hospital and underwent a MRI of her cervical spine by Dr. Putnam that revealed mild disc degeneration C5-C6, C6-C7 level, mild to moderate osteoarthritis C5, C6, C7, mild disc osteophyte complex bulge and nerve root compression C2-C3, C3-C4, C4-C5 on the left, mild to moderate disc osteophyte complex bulge and nerve root compression C5-C6 on the right and left, mild disc osteophyte complex bulge C6-C7, and no disc herniation (Tr. 512).

♦ On April 27, 2006, plaintiff went to Barton County Memorial Hospital and underwent a lumbar spine x-ray by Dr. Pottenger that showed mild depression of the superior end plate of the vertebral body of L2 (unchanged), which may be the result of an old injury, and evidence of degenerative disc disease at the L5-S1 level (Tr. 1256).

♦ On April 27, 2006, plaintiff went to Barton County Memorial Hospital and underwent a MRI of her cervical spine by Dr. Pottenger that showed evidence of degenerative disc disease of the C5-C6, C6-C7, and C7-T1 levels with central sub ligamentous bulging of the intervertebral discs into the ventral aspects of the spinal canal (Tr. 1258); the notes conclude that "[t]he study fails to demonstrate significant narrowing of the AP diameter of the spinal canal or significant foraminal stenosis. Signal intensities from the cord are within normal limits. The cerebellar tonsils are in normal positions" (Tr. 1258).

♦ On April 27, 2006, plaintiff went to Barton County Memorial Hospital and underwent a MRI of her lumbar spine by Dr. Pottenger that showed evidence of degenerative disc disease at the L5-S1 level with a central posterior disc bulge, which did not significantly impinge upon adjacent nerve rootlets or significantly narrow the AP Diameter of the spinal canal, evidence of facet hypertrophy at the L4-L5 and L5-S1 levels bilaterally without significantly narrowing the neural foramina or AP diameters of the spinal canal, no abnormalities of the conus medullaris, and slight depression of the superior end plate of the vertebral body of L2 most consistent with that produced by Schmorl's node (Tr. 1259).

However, Dr. Sprenkle indicated in all three of his medical source statements that he had not relied on any clinical tests in reaching his opinions:

In the March 5, 2007, medical source statement, the doctor noted that he had not relied on "[s]pecific clinical tests" in arriving at his opinions (Tr. 961);

In the September 17, 2007, medical source statement, the doctor noted that he had not relied on "[s]pecific clinical test results" in reaching his conclusions (Tr. 771); and

In the December 3, 2007, medical source statement, the doctor identified plaintiff as a "malingerer" and indicated that he had not relied on "[s]pecific clinical test results" in reaching his conclusions (Tr. 881, 884).

In addition, I have reviewed all of Dr. Sprenkle's contemporaneous medical records and can find no mention of these tests, much less a discussion their relevance to plaintiff's various conditions or her alleged limitations, and plaintiff's counsel has failed to refer me to any.

Based on this analysis, I find that the ALJ did not err by refusing to rely on the opinions of Dr. Sprenkle.

## VI. CONCLUSIONS

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                                        /s/ Robert E. Larsen
                                   ROBERT E. LARSEN
                                   United States Magistrate Judge

Kansas City, Missouri
February 11, 2011